**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1911-24

IN THE MATTER OF THE
ESTATE OF EDMOND
DWECK, deceased.

_____

Argued June 3, 2026 – Decided August 4, 2026

Before Judges Smith and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Chancery Division, Monmouth County, Docket No. P-000204-23.

Edmond S. Dweck, appellant, argued the cause on appellant's behalf.

Luke J. Kealy argued the cause for respondent Isaac Dweck (Greenbaum Rowe Smith & Davis, LLP, attorneys; Luke J. Kealy, on the brief).

PER CURIAM

Petitioner Edmond S. Dweck, decedent's grandson, appeals from a final judgment after a bench trial in a will contest, where the court found respondent/decedent's son, Isaac Dweck, did not unduly influence decedent Edmond Dweck into revising his last will and testament. Petitioner asserts the

court erred in finding respondent was not in a confidential relationship with decedent and suspicious circumstances did not exist regarding the revised will's execution.

After hearing the testimony of numerous witnesses, making detailed credibility and factual findings, the trial court concluded there was no undue influence. After our careful review, we concur there is no evidence of undue influence and affirm the judgment of the trial court.

However, because petitioner had a valid basis to bring his claim against the Estate, we vacate the portion of the final order denying petitioner attorney's fees and remand that discrete issue to the trial court to consider petitioner's application for the Estate to pay reasonable attorney's fees.

I.

The voluminous record reveals decedent and his wife, Virginia Dweck, had three children: Frieda,[1] Isaac, and Sam, petitioner's father. They were part of a close-knit community where everyone was aware of everyone else's financial status, and those matters were openly discussed. Of note, it was known to the family that Sam's wife, Carolyn, came from a wealthy family. When

---

[1] We use first names to avoid confusion as the parties, decedent, and many of the witnesses share the surname Dweck. We intend no disrespect.

A-1911-24

decedent retired in 1997, Isaac told decedent he did not have enough money to retire. Nevertheless, decedent, who was characterized as very intelligent but stubborn by all witnesses, retired. After he did so, he began to rely on Isaac to facilitate payment of his financial obligations. Isaac paid all the bills out of his parents' bank account, utilizing their money. He also wrote out a monthly check from the account for his parents to use for their own expenditures. Those checks were initially $2,700 a month. However, the amount eventually dwindled to $1,300 a month as the couple's finances became depleted.

Isaac and Sam had been in business together since 1986. They owned six or seven retail stores named Kid's Place, with Isaac handling the financial records while Sam acted as the buyer. During the COVID-19 pandemic, the two brothers took out personal loans to keep the business in operation. Each was personally liable for those loans. The two had a buy/sell agreement in the event one predeceased the other, which required the surviving brother to buy out the deceased brother's share. Both Isaac and Sam maintained a three-million-dollar life insurance policy to effectuate that buyout. The beneficiary of each policy was the surviving brother.

A-1911-24

Sam died on February 5, 2021, from COVID-19. Pursuant to their agreement, Isaac paid the proceeds of the life insurance policy to Sam's widow, Carolyn, in exchange for all remaining shares of the company.

Decedent's wife (petitioner's grandmother) passed away in December 2022, followed by decedent in January 2023. Decedent and his wife had executed wills in 1998, which distributed their estate as follows: fifty percent to Frieda, twenty-five percent to Isaac, and twenty-five percent to Sam. The wills contained a per stirpes[2] provision, bequeathing each beneficiary's share to that beneficiary's children in the event any beneficiary predeceased them both. The wills did not contain specific bequests to any of the grandchildren.

In 2013, the decedent and his wife executed codicils to bequeath their estate equally in thirds to their adult children. The per stirpes provision remained in place and, again, there were no specific bequests to any of the grandchildren.

---

[2] "If a governing instrument requires property to be distributed 'per stirpes,' the property is divided into as many equal shares as there are: (1) surviving children of the designated ancestor; and (2) deceased children who left surviving descendants. Each surviving child is allocated one share. The share of each deceased child with surviving descendants is divided in the same manner, with subdivision repeating at each succeeding generation until the property is fully allocated among surviving descendants." N.J.S.A. 3B:1-2.

Twenty days after Sam passed away, decedent and his wife revised their wills and executed new, mirror documents on February 25, 2021. These wills bequeathed one-third of the estate to Frieda and two-thirds to Isaac. Although it contained per stirpes provisions for Frieda and Isaac's children, there was no direct distribution to Sam's children.

The Estate's primary asset at the time of decedent's death in 2023 was a residence in Deal, which was sold after his death and netted a profit of approximately $6,000,000.

After decedent died, petitioner learned of the disinheritance under the 2021 Will. Petitioner filed a verified complaint in Monmouth County, seeking to set aside the February 25, 2021 Will, alleging undue influence and specifically claiming Isaac "exploited [d]ecedent's vulnerability and coerced [d]ecedent to execute the [2021 Will]." He asserted decedent and his wife had always wanted to support their grandchildren, and the disinheritance of Sam and his children contradicted this "long-held intent."

A trial was held over the course of three non-consecutive days. The trial court heard testimony from several witnesses, four of whom had no financial interest in the case. At the close of petitioner's case, Isaac moved for a directed verdict, asserting petitioner failed to prove decedent had been subjected to undue

5

influence. The court denied Isaac's motion, concluding, when viewed in the light most favorable to petitioner, there was "a basis upon which a fact finder could conclude [he had] established . . . the claim."

Petitioner testified he had a great relationship with his grandparents and believed his relationship grew only stronger after Sam's passing. Petitioner testified Isaac was responsible for decedent's bills and medical paperwork. When petitioner discussed his grandparents' financial affairs with Isaac, Isaac told petitioner not to worry as he had everything under control. After his father had passed, petitioner asked decedent whether he had changed his will. In response, decedent told him "he hadn't changed his will in [thirty] years and that it was a third, a third and a third."

Isaac testified he had no knowledge prior to the execution of the 2021 Will that decedent wanted to change his will to benefit him. Rather, Frieda had notified him of the beneficial change after its execution. Isaac testified decedent and his wife changed their wills in 2021 of their own accord the week after Sam passed. He admitted he had overseen decedent's finances since 1996, including house expenses, homeowners' insurance, utility bills, and tax returns. Further, Isaac testified he would loan money to decedent when decedent's funds grew low.

6

With respect to the execution of the 2021 Will, Isaac testified he spoke to his father's attorney, Stephen J. Oppenheim, multiple times, however only at decedent's direction. Specifically, decedent asked Isaac to call Oppenheim on February 16, 2021, to revise the prior will. Regarding his conversation with Oppenheim, Isaac testified he discussed only Sam's death and decedent's wish to review the will. Isaac also confirmed he assisted Carolyn after Sam's passing by reviewing her bills and finances.

Abe Gabbay, Carolyn's brother-in-law, testified decedent appeared visibly upset at Sam's shiva and looked frail. According to Gabbay, when they went through Carolyn's bills, Isaac appeared agitated, nervous, and erratic while looking for documents. Gabbay testified he did not believe it was decedent's decision to change the will after Sam's death.

Carolyn testified, after shiva was held for Sam, she asked Isaac to help her with her finances. She testified Isaac "absolutely" had a "good idea about [her] financial picture" afterwards. It is undisputed Carolyn received five different insurance policy payments as the result of Sam's death, totaling approximately nine million dollars.

A-1911-24

Carolyn testified she did not believe decedent would independently and voluntarily remove Sam or his children from the will. She testified decedent loved her children and they were a large part of decedent's life.

According to Frieda, decedent's "wish" was to take care of her and Isaac because "he felt [Sam's family] w[as] taken care of." Frieda testified, around the time of the 2021 Will's execution, decedent "was mobile and all mentally sharp." Further, decedent was an intelligent and very stubborn man. Frieda testified she met with decedent and her mother after Sam's shiva, and decedent told Frieda he wanted to "leave 50/50 percent to [Isaac] and [her]." He felt Carolyn and Sam's children were taken care of and his wife agreed. Frieda told them she only wanted a third of the estate.

Frieda testified she and Isaac did not discuss decedent changing his will prior to decedent's February 16, 2021 meeting with Oppenheim. She was comfortable with the 2021 Will's distribution to her and Isaac in unequal amounts, stating she "didn't have a choice. It was my father's decision."

Julie Botton, Frieda's daughter, testified, out of all thirteen grandchildren, she was the one who spent the most time with decedent and his wife. When asked why decedent and his wife changed their wills, Botton testified:

> Because Uncle Sammy made sure that Carolyn
> and the kids were taken care of with generous . . . death

A-1911-24

insurance, so that they thought they were well cared for and that my mother at the . . . time had been married to someone who was wealthy and that [respondent] needed it the most in their minds.

Oppenheim testified he was legal counsel for decedent and his wife with respect to their estate planning. The first will, dated December 10, 1998, divided their estate unequally, with fifty percent to Frieda, and twenty-five percent to Isaac and Sam respectively. Oppenheim testified decedent's wife's will was a "mirror image." On August 15, 2013, both decedent and his wife, with Oppenheim's assistance, executed codicils providing all three of their children equal one-third shares of their estate.

On February 16, 2021, Isaac contacted Oppenheim and informed him about Sam's death, telling him decedent wanted to amend his will. Oppenheim testified Isaac did not give him any specific instructions that day regarding the contents of decedent's will. Decedent spoke with Oppenheim the following day, and informed Oppenheim he wanted to leave their estate entirely to Isaac. Decedent stated Frieda didn't need money as she was about to marry a wealthy man, and Sam had left his family wealthy. However, the same day and after speaking with his wife, decedent called Oppenheim again, asking him "to prepare [w]ills or [c]odicils each leaving the [surviving spouse's] estate, two-thirds to Isaac and one-third to Frieda." Oppenheim testified he did not have

9

discussions with decedent and his wife about the impact of the 2021 Will on Sam's descendants since he assumed they understood.

Oppenheim testified Isaac drove decedent and his spouse to his office on February 25, 2021. However, Isaac did not enter the room while decedent and his wife executed the 2021 wills.

After trial, the court dismissed petitioner's complaint with prejudice, denied his application for counsel fees and costs, and allowed Isaac to proceed with the probate of the 2021 Will. The court found petitioner had not established a confidential relationship, and "there was no credible evidence to establish the required suspicious circumstances for the burden [to] shift either."

Petitioner filed a motion for reconsideration, arguing: (1) "the [c]ourt's decision disregarded the facts known by the [petitioner] at the time that they filed the complaint"; (2) "the [c]ourt's findings that there was no reasonable cause for them to challenge the will was contradictory to a decision the [c]ourt made during the course of the trial [when it denied summary judgment]"; and (3) "the [c]ourt misapplied the legal standard for a fee application."

The trial court denied petitioner's motion for reconsideration, finding:

> [T]he [petitioner] ha[s] not put forth a basis for the [c]ourt to reconsider its decision denying the[] application for attorney's fees. The [c]ourt finds that [petitioner] ha[s] not pointed to any probative

competent evidence the [c]ourt failed to consider or appreciate the significance of, nor did [petitioner] identify any palpably incorrect or irrational basis upon which the [c]ourt based its decision.

Further, the court noted petitioner did not "challenge[] nor ask[] the [c]ourt to reconsider its ruling regarding the validity of the will, nor its credibility findings."  This appeal followed.

## II.

Our "review of a judgment following a bench trial is limited." Accounteks.net, Inc. v. CKR Law, LLP, 475 N.J. Super. 493, 503 (App. Div. 2023) (quoting Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011)). "The trial court's factual findings are entitled to deference on appeal so long as they are supported by sufficient credible evidence in the record."  Ibid. (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 483-84 (1974)). "Deference is particularly appropriate when the court's findings depend on credibility evaluations made after a full opportunity to observe witnesses testify, Cesare v. Cesare, 154 N.J. 394, 412 (1998), and the court's 'feel of the case.'" Accounteks.net, 475 N.J. Super. at 503 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)).  By contrast, the "trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference" and are reviewed de novo on appeal.  Rowe v. Bell & Gossett Co.,

11

239 N.J. 531, 552 (2019) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Those principles apply equally in will contests. See In re Livingston's Will, 5 N.J. 65, 78 (1950) ("The findings of the trial court on the issues of testamentary capacity and undue influence, though not controlling, are entitled to great weight since the trial court had the opportunity of seeing and hearing the witnesses and forming an opinion as to the credibility of their testimony."); In re Will of Liebl, 260 N.J. Super. 519, 524 (App. Div. 1992) (a trial court's factual findings "should not be disturbed unless they are so manifestly unsupported or inconsistent with the competent, reasonably credible evidence so as to offend the interests of justice").

"A challenger can set aside a decedent's will . . . on the basis of undue influence." In re Est. of Folcher, 224 N.J. 496, 512 (2016). Our Supreme Court has explained, "undue influence is a mental, moral, or physical exertion of a kind and quality that destroys the free will of the testator by preventing that person from following the dictates of his or her own mind as it relates to the disposition of assets[.]" In re Est. of Stockdale, 196 N.J. 275, 302-03 (2008). Undue influence "denotes conduct that causes the testator to accept the 'domination and influence of another' rather than follow his or her own wishes."

Id. at 303 (quoting Haynes v. First Nat'l State Bank, 87 N.J. 163, 176 (1981)). The undue influence must exist at the time the will was executed. Ibid.

"Ordinarily, the burden of proving undue influence falls on the will contestant." Ibid. However, "if the will benefits one who stood in a confidential relationship to the testator, and if there are additional 'suspicious' circumstances, the burden shifts to the party who stood in that relationship to the testator." Ibid.

"In general, there is a confidential relationship if the testator, 'by reason of . . . weakness or dependence,' reposes trust in the particular beneficiary, or if the parties occupied a 'relation[ship] in which reliance [was] naturally inspired or in fact exist[ed].'" Ibid. (alterations in original) (quoting In re Hopper, 9 N.J. 280, 282 (1952)). However, "the mere existence of family ties does not create . . . a confidential relationship." Est. of Ostlund v. Ostlund, 391 N.J. Super. 390, 401 (App. Div. 2007) (quoting Vezzetti v. Shields, 22 N.J. Super. 397, 405 (App. Div. 1952)).

Suspicious circumstances may arise from a "drastic change in the testamentary dispositions" of the testator. Haynes, 87 N.J. at 177. Evidence of suspicious circumstances need only be "slight," although the contestant of a will must present some evidence establishing suspicious circumstances. Stockdale, 196 N.J. at 303. If the challenger of the will successfully shifts the burden of

proof to the proponent of the will, "[t]hat burden can be overcome based on proof of no undue influence by a preponderance of the evidence." Folcher, 224 N.J. at 512.

Petitioner contends the court failed to recognize the weight of "competent, relevant and reasonably credible evidence" of suspicious circumstances and a confidential relationship. We agree.

We conclude petitioner established prima facie evidence of a confidential relationship. Isaac was the only child of decedent who was authorized to handle all of his parent's finances. Although he issued a monthly stipend from his parent's funds, he determined the amount. Isaac admitted he alone had overseen decedent's finances since 1996, including house expenses, homeowners' insurance, utility bills, and tax returns. He also admitted he loaned money to decedent from time to time when decedent's finances were low. That relationship established the requisite dependence of decedent upon Isaac. We disagree with Isaac's claim that petitioner was required to demonstrate some weakness in decedent, as either weakness or dependence is sufficient. We reject Isaac's claim that he and decedent dealt with one another on equal terms and conclude petitioner demonstrated decedent's trust in Isaac and a "relation[ship]

in which reliance [was] naturally inspired or in fact exist[ed]." Stockdale, 196 N.J. at 302-03.

Likewise, petitioner successfully established a prima facie case of suspicious circumstances. We have previously stated suspicious circumstances need only be slight. Here, decedent and his wife changed their wills largely in favor of Isaac only twenty days after Sam's death. Additionally, Isaac initiated the contact with Oppenheim and requested a meeting for the will revision. Finally, Isaac drove decedent and his wife to Oppenheim's office to execute the wills, although he lived in New York and there was testimony that the grandchildren drove decedent and his wife to most appointments and outings. These facts more than establish suspicious circumstances such that the trial court should have shifted the burden to Isaac to prove lack of undue influence. Folcher, 224 N.J. at 512.

However, the trial court's failure to shift the burden is harmless error[3] because, in an abundance of caution, the trial court found, even if the burden

---

[3] It is fundamental that a trial error will not be ground for reversal if it was "harmless error." Willner v. Vertical Reality, Inc., 235 N.J. 65, 79 (2018). "[T]rials . . . are not tidy things. The proper and rational standard is not perfection . . . no trial can ever be entirely free of even the smallest defect. Our goal, nonetheless, must always be fairness.'" State v. R.B., 183 N.J. 308, 333-34 (2005) (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953)).

A-1911-24

had shifted, petitioner had failed to show any undue influence. The trial court

found:

> As far as undue influence, even if there was a burden shift and the [c]ourt had found a basis for that shift, the [c]ourt finds the credible evidence establishes that [respondent] did not exercise any undue influence of his father in the creation or execution of -- or contents within his February 25th, 2021 will.

We agree. Even if we assume Isaac had informed decedent of Carolyn's increased wealth as a result of Sam's death, and that after Sam's death, he was personally and solely liable for the pandemic loans he and Sam had taken to keep their business afloat, those facts cannot establish undue influence. Undue influence requires "conduct that causes the testator to accept the 'domination and influence of another' rather than follow his or her own wishes." Stockdale, 196 N.J. at 303. After making detailed credibility findings, the trial court stated:

> [Petitioner] points to the timing of the will being several weeks after Sam's passing.
>
> [Petitioner] also points to the timing at which Isaac assisted Carolyn with her family's finances and becoming aware of Sam's financial circumstances.

---

These principles are codified in Rule 2:10-2, known as the harmless error rule. It instructs that "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result." Ibid.

Then [petitioner] also points to the fact that [decedent] had a good relationship with Sam's children.

Certainly, anyone would expect a father would be in grief over their son's death.

However[,] the timing of the change in the will actually makes sense.

First, every will executed by [decedent and his wife] for that matter distributed the estate -- their estate to their children.

Although there were provisions within that distribution that would have left a child's share to their children, that is the grandchildren if a child predeceased [decedent].

There was never any allocation specifically to any grandchild.

The focus of the wills [was] always the distribution of the estate amongst the children. That's the three children.

When one of those children, [] Sam passed, it would make sense for the parent to want to adjust the allocation for the benefit of their living children.

Second and similarly, although [decedent] may have had a good relationship with Sam's children, the focus of all the wills was for the benefit of [his] children, not his grandchildren.

Despite the [petitioner's] argument, the will . . . did not remove any allocation to Sam's children, meaning [decedent's] grandchildren. Rather, it removed an allocation to Sam.

. . . .

> The focus of multiple wills, the 2021 will, the 1998 will, as well as the pre-1998 will from New York was the children and based an allocation upon [decedent's] perception of their respective financial need.
>
> It was not based upon love for or relationship with any child . . . . .

The evidence in the record supports the fact decedent and his wife had always considered their children's relative financial positions in forming their bequests, and there was an established history of bequests made based upon the then financial need of each beneficiary. And, although all iterations of their wills contained per stirpes language, no direct bequest was ever made to any grandchild.

Additionally, there was no demonstration decedent or his wife lacked testamentary capacity in 2021 when they executed their wills. There was no suggestion of a "mental, moral, or physical exertion of a kind and quality that destroys the free will of the testator by preventing that person from following the dictates of his or her own mind as it relates to the disposition of assets[.]" Id. at 302-03. Finally, the timing of the revisions to the wills so soon after Sam's passing was sufficiently explained by the COVID-19 pandemic, which had

18

affected many people in decedent's community and was the cause of Sam's death.

However, because petitioner established sufficient facts to demonstrate a confidential relationship between Isaac and decedent, and suspicious circumstances existed, petitioner was entitled to have reasonable attorney's fees paid by the Estate. See R. 4:42-9(a)(3) ("[I]f it shall appear that the contestant had reasonable cause for contesting the validity of the will or codicil, the court may make an allowance to the proponent and the contestant, to be paid out of the estate."); see also In re Probate of Will & Codicil of Macool, 416 N.J. Super. 298, 313 (App. Div. 2010). Therefore, we reverse the portion of the order denying counsel fees and remand to the trial court for a consideration of petitioner's application for attorney's fees, to be paid by the Estate.

Affirmed in part and reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hasley

Clerk of the Appellate Division

19

A-1911-24